All right, the first case we'll hear this morning is Tansley v. Danielsetal, 17-2023. I assume you're in no relation to the Mary Brogan we just heard. You are Mary Brogan, right? That is correct. Yeah, interesting. Good morning, your honors. I am Mary Elizabeth Brogan on behalf of the appellant. We are here today to request a reversal and remand of the district court's decision. And let's look at why the district court committed a reversible error as a matter of law. First, the district court failed to apply the 12B6 standard in determining the sufficiency of the second amendment complaint where there were highly artistic and complex works. Is your argument starting even earlier than that? Does your argument start with this is just the appropriate forum to make this kind of decision? I would give you that, yes. In terms of the status of where the case is procedurally, absolutely. Because you seem to make the argument that it may be that expert testimony is necessary, depositions, and the like. That's correct, particularly when there's highly artistic works and complex works, which these are. On that note, I also have a question. It seems that courts, although you've made this distinction, it's an interesting one, but haven't other courts dealt with films and other musical type recordings before and not applied the standard? In this circuit, Your Honor, there are perhaps other circuits, maybe the Ninth Circuit, where there's a heavy load of those type of, you know, type of product. In this circuit, even the Second Circuit, is limited. The answer is no. There's not this type of comparison of a film v. film. We've had a couple cases, they're not presidential opinions, but we've had a couple cases where we've found dismissals at the motion to dismiss stage. If you're speaking of Tanakami or Winstead or Jackson v. Booker, yes, but actually none of those have the same type of product that we have here. That's the difference. I understand that. It's a book versus a film, or a book versus a CD. So this is highly unusual. These are What didn't happen here with the judge, with the lower court, is he didn't look at that. He didn't look at all the questions you're asking me right now. He didn't even have that in his analysis, in his opinion. He didn't talk about the highly artistic works that have been decided and how these compare to the ones here. And even in Whelan Associates, which is a Third Circuit case, it's held that early determination of substantial similarity when the works are highly complex and artistic is misleading and should not be done. And this is true here, as you've just recognized. In addition, as I said, there was no discussion of this in the judge's opinion. Another error is that this particular opinion radiates expert-type analysis. It doesn't have the lay observer type of feel, and let me explain to you why. What error occurred here is that procedurally, the court had these works way early in the case. He should have ruled. If he was going to rule a lay observer test, a real objective test, he had these over a year before this decision was being made as to what happened here, as to the similarity. You're saying he had the film clips? He had all of it beforehand, not the clips, but he had the works themselves well in advance of at least a year before he rendered his decision. So he would have been all right if he had ruled sooner? Is that what you're suggesting? No, what I'm suggesting is that if he was really going to apply the proper lay observer test, he would have ruled earlier, yes. Instead, what he did was he allowed the appellees, the defendants at the time, to walk into court and present persuasive selected video clips and snippets without prior notice that they were going to do it, and without prior disclosure of the contents from which they were going to present. We had no knowledge and we had no content of what they were going to present. This is important. Let me tell you why. Essentially, what happened at the hearing before the court was the defendants came in and they presented these one-sided, incomplete snippets without the notice, without the prior disclosure of the content. This is critical, over-objection from us. And as a result, they presented dissection of the works, not in completion, so they don't show all of the substantial similarities or what they want. And the judge saw all this. And this is an expert type of analysis that occurred here. The lawyers became, in this case the defendants, became the experts. They dissected the work. That's not the lay observer test in the circuit. Didn't the opportunity also put in contrary snippets and arguments? It's kind of extraordinary, a three-day-long hearing for a motion to dismiss. Yes, because there were a number of parties. But, yes, we did only over-objection, but we never had their actual snippets, the content of what they were going to present to the court, prior to them doing so. We didn't have that benefit. Independent of that, the law in this circuit is clear. You don't allow this type of expert analysis, which is what occurred here, this dissection, without the benefit of experts. That's secondary to this should have even been before the court. Do you have an expert lined up? No, Your Honor, no. If you needed expert analysis, how can you bring the lawsuit without having that lined up in advance to say that they've got these substantial similarities? The point is that we were at the pleading stage, Your Honor. We were not engaging in, we had some discoveries. So an expert could say they're not substantially similar. An expert could say even more. I mean, we had in the works an expert in terms of an opinion, but that opportunity wasn't presented to us to be able to present it to the court on that day. And that is what the error is. But you make it sound a little bit, you know, if someone was here in the courtroom just listening to your argument, you make it sound a little bit like, well, they just decided to file the grant, the motion to dismiss. But there were arguments that extended over a period of six months. There were how many hearings? Three days of hearings on this case. And you actually submitted both cream and empire to the district court. You had to think that there was going to be, and you invited a side-by-side comparison. In fact, you suggested the side-by-side comparison in your second amended complaint. So what are you saying that the district court did wrong? That's what I'm sort of trying to get at. What did they do wrong here? Besides rule it against you. Well, there's a lot they did wrong. They should have engaged in this type of dissection and this expert type of analysis. At this point, there was no opportunity to have discovery. There was no opportunity to bring that expert. But didn't you invite that by suggesting substantial similarity as a matter of law? I mean, it turned out that the court ruled the exact flip side of what you were looking for. But it seems to me from looking at the records, you invited this comparison. Absolutely not, Your Honor. It was never invited. We pled and showed, and it wasn't all inclusive in what we pled, all of the similarities. That was just a sampling of it. And we're required to please substantial similarity in our pleadings. We don't have to prove it at that point. I'm going to ask you a couple of other questions if I could. Sure. So the cream was copyrighted. There was no question. Nobody disputes that. It was copyrighted in 2005. And what is it that you're saying is protected? Ideas are not protectable under copyright law. So this idea of an African-American film executive from Philadelphia, all right, who had this record company and had, I won't go into the different elements, but is that idea in and of itself protectable? No. I think the law is pretty clear that ideas are not protectable. What it is here is protectable. Well, that's what I'm sort of trying to get my arms around in looking at this record. Understood. So what here is protectable is those unique expressions of how Mr. Tanksley expressed, if you will, how did he portray that whole, his whole storyline. How does he portray it? So the example about the urination scene is very, very important because aesthetically when you look at it, the question is that the judge didn't engage it. Okay. He did a subjective analysis, not an objective analysis. What he didn't do was he didn't ask the question and do the analysis of what is it in cream that's a unique expression and whether or not an ordinary layman would expect that to be shown or appear in Empire. That's what the test is that he didn't do. And so what it is, is would you expect as an ordinary lay observer to see a urination scene with a hit and the exact setup as you would? There's a myriad of ways that somebody, a hit could be done. Well, it could be done in a car on the side of the road. You don't have to have a urination scene. They do. And so that example itself is aesthetically unique and it's value to my client, the plaintiff, my client, and how he put that together. That's one example. Let me stop you right there. That's one example. I understand. Would that be enough in and of itself? In my opinion, yes. I mean, I would say that in this circuit, given the Floyd murder case and the look and the feel of what is artistic and the level, the size and scale, what do we look at? That in itself is enough in my opinion. But we don't even have that. We have so much more than that. That's just one example. That's one simple example. It's so unique and so different. Aesthetically, when you see it, where do you see that? You don't. We've got all the other bells lined up, all the other things lined up. You know, the idea of the, you know, rising to the top, what else is setting, 50%, one half of the company. All the storylines are set up. Okay. The incurable disease, that's another one. It's very, very unusual. I mean, where do you see that? You don't see that anywhere in any kind of work of an incurable disease. And then the falling apart of his family trying to vie for that 50%. Not 51%, mind you, not 70%, but 50%. Those things are very unique expressions that you cannot, that this judge did not even look at or make an analysis about. He ignored it. By the way, he didn't even look at the copying element. Okay. Here's the copying element. You have to prove for a copyright infringement case. We had the Lee Daniels admission. That wasn't even discussed here. That element. You're talking about the, that's the, I guess, media interview in a red carpet? Yes, exactly. And that was not even addressed here, like in the T.B. Bay case, where they had an admission. It's recognized that a defendant's, an offender's admission. It's not that they really concede access. They actually, they don't concede access. They say, well, let it go for now. They don't even address access. And the truth is, the appellant's going after it. They didn't contest it either, though. They didn't contest it, absolutely not. That's one of my questions as well, because the case video, you know, you bring up a point there, but is it really a harmful error because they conceded access anyway? Well, it's harmful error in that the judge decides to say that we're not going to look at it, but yet uses it against us. So in that regard, it's harmful error. If you say you're going to do something, but then you do the total opposite, that's harmful error. And use it against us. And we didn't even use it for it. We didn't use the past video for access. That wasn't our argument about access. So we have a letter, as it would be, which is the Bressler admission that there was obviously access, that the client presented this to Mr. Daniels. There's no dispute about that. So we wouldn't use the past video. That wasn't in our interest. And the judge should not have looked at it or considered it as he said he would not, because it wasn't authentic. And we didn't have the opportunity to present it in the evidence to show that it wasn't authentic or not. You actually presented that to the court, wasn't it you folks? No, Your Honor. That was the film office that suggested it to the court. We never presented it to the court in our hearings at all at any time. Just one other point, if I may. Part of the issue here in terms of the error is that the court doesn't conduct a full analysis on the substantial similarity as what is dictated in this circuit. If you look at the University v. Selk House case, which was actually sent back, reversed, and remanded, because the court didn't engage in a full analysis. That's what we're asking you to do. It's in this court. That's the precedent that's here. And the only other point I have. Well, I think you're pretty much done. Do you have time? Yes, I do. Thank you. Thank you very much. Thank you. Good morning, Your Honors. Good morning. Guys, I'm going to pull that thing up a little more. Oh, I can't. Okay. I'm going to have to hold it. Okay. Okay. Oh, jeez. Stand up. Thank you. My name is Pedro Felipowicz. I, too, represent the plaintiff about Clayton Thanksley. And to just continue on where my colleague left off, I'd like to make a point about a case holding here in this circuit in Leonard v. Temtec in 2016. Most of you should know the contributory liability, which I'll get into next. But there you had no issue finding direct liability. And what we have there was a photograph of an event that appears in nature itself. And the only value added by the copyright holder, Mr. Leonard, was that he enhanced it by adding certain colors. And then the defendants used those photographs in their other work, which was much larger presentations, videos, the promotional material. So what the court did then is what it should do now, which is recognize that it's enough that the copyrighted elements for one work appear somewhere in the other work. It doesn't have to be that the statute is not designed to protect only works that end up being exactly, you know, very similar or exactly the same, which appears to be the standard, given our similarities. Instead of looking at the evidence properly, like you should have done here, Coding 2 has protective elements that really appear all over Empire. My colleague went through a couple of them. And now I'll talk about contributory liability here. Contributory liability is not... But the predicate for contributory liability is liability by the first user, right? That is one idea. That's the first element. And let's address that now. I was going to do it at the end, but I'll address it now. The direct infringement is a prerequisite, if you will, of course. And one of the ways, like my colleague said, is you can cite an opinion, Judge Smolski said, but it could be an admission. Well, we have a 2015 interview, which preceded this litigation, and I must add that our opponent's brief erroneously states that the interview occurred during the pending litigation. Why is that important? Because the reasonableness of his response kind of changes whether or not it was during the litigation or it was before litigation, when you have lawyers dealing with it versus when he's, you know, before having considered it. So it's not a tensive proposition that we are asking you to draw. It's a reasonable inference that it's a tensive admission. We're a reasonable person under the eye of the law. Why wouldn't he deny it? Instead, you saw it's located on the thumb drive portion of your appendix, and it's also available on the World Wide Web. And on the pension case holding, it was available to Judge Smolski to make a determination. At the very least, we didn't include it because we didn't put it in the complaint, but at the very least, it is proper to allow the amendment of the complaint. Why? Because it's a game changer. We have the access, as you said, they considered it. We have the ownership and copyright. The next thing is proof of direct copy. And an admission of an opponent is that proof. So we don't even need to get into the entirety of the substantial summary analysis. That only happens if we can't have any direct proof of copy. And it's important. At 26, that states the claim. Now, the contributory. Quickly, we have the written film officer who really organized this event. Fleet World case in this jurisdiction, Fleet World Artista Records versus Fleet World, held that material contribution to the amusement was met when the operator provided facilities for work and paid direct infringement. So you're saying during the Philly pitch, if I get your argument right, you're saying during the Philly pitch, the fact that they didn't require any type of release or contract at all from the judges, subjects them to liability for contributory copyright infringement? No, not that effect counts, but that effect is not what was suggested. What was suggested is that they did everything that the Fleet World provided all the facilities, but they didn't want. What did they want? They selected the participants. They screened their works that were going to be pitched. They hand-selected the judges. It was their action that determined ultimately the identity of both the plaintiff and defendant in this matter. They invited these two people. It wasn't open to the public. It was play-by-only knowledge. But can it really be said that they contributed to the infringement that happened so many years later? Well, it certainly was made light, if I could just finish this, you know, almost definitely. On that note, you know, years later doesn't necessarily mean that they couldn't have known at the time. They were required to do a juror-reasonable inference, and the fact that he pled is the same in Fleet World. Fleet World landlord actually drafted the leases that were signed and produced. These defendants also drafted the leases, but they didn't produce them. What they were asking you to do is draw just a small inference that we needed in 1286, which is constructive knowledge. But the virtue of those leases that were not produced and, you know, is this court going to tolerate them from really later? They're never going to be produced unless this is overturned, and that's probative evidence. That's all I have, Your Honors. All right. Thank you, Counsel. We'll hear from the appellees. Good morning. May it please the Court, Richard Stone for the Fox appellees. The court below did not err either in the procedure employed nor in the result reached in granting the motion to dismiss because the works are not substantially similar as a matter of law. I take disagreement with the appellate's position that the court below did anything other than a thorough analysis after multiple hearings, viewing the works, viewing excerpts of the works, issued a 51-page comprehensive decision that goes through every element of each work in detail. So it's a very thorough analysis. As I understand it, the appellant described four major errors to what the court did below, none of which have any merit. Mr. Stone, do you concede that the appellant properly pled not only access but copy? No, I do not believe that they appropriately pled copying. I don't believe the works are similar enough for there to be even an inference of copying. And then there's, of course, the other element of unlawful copying as to access. With respect to the pleading standard, yes, we chose not to contest that because you cannot contest when somebody pleads those facts. That's different than what we're dealing with here, which is a situation where we're not pleading a course of conduct or interactions or events. We are pleading two works are substantially similar, and those works are what they are and the courts can compare them. Can you cite to us a case that our circuit has had that involved two works like this with two movies with themes and plots that have similarity? Yes. I don't see any other cases where we've had something quite like this. My recollection is in the Winstead case, it was a music CD and a film by the rappers known as 50 Cent, and that was compared to a script written by the plaintiff, so it was two literary works. And if you look at the Whedon & Associates case out of the Third Circuit, the Whedon & Associates of Third Circuit held that the lay In that case, the court went on to say that test is not appropriate for something like computer software, which is outside the ordinary canon, in which case experts may be necessary. But in Whedon, the court actually held expert testimony was not permitted on the way. Along those lines, I mean, your adversary tries to make a distinction or argues for a distinction about highly autistic works. I mean, you have to admit things like photos or paintings or even an advertisement are much easier to compare than something more nuanced like a film, television, or musical piece. What do you think about her distinction? On occasion, there was a Westminster case that just came out of the Ninth Circuit involving the photograph of Michael Jordan dunking the basketball, which then became the Nike logo, and that has a discussion about the fairly complex nature of artistic decisions made in photography. But there are numerous cases out of numerous jurisdictions in which literary works, audiovisual works are compared. In the Ninth Circuit, most recently the Silas case involving the HBO show Ballers. The Ninth Circuit recently upheld a motion to dismiss in that case. Of course, the Second Circuit, which the Third Circuit has drawn from beginning with the Armstein-Porter case and then continuing through Guido. In the Second Circuit, we have the rare R-E-Y-H-E-R, which is the Sesame Street film, as I recall, and numerous other literary works and films and audiovisual works that have been adjudicated on a motion to dismiss. In fact, since Guido, there's been 48 cases, 15 of them were audiovisual literary works, and then 15 of those cases, post-Guido, motions to dismiss. So is that a long way of saying you don't agree with the distinction? Yes, that's a very long way of saying I don't agree with the distinction, Your Honor. It isn't. I mean, to compare these two, Empire and Cream, seems to me, to get to the basic issue of substantial similarity, the key issue here, that this is a very factually intensive exercise. And, you know, whether it was invited or whether it was assumed by the district court, notwithstanding how the district court came upon it, I mean, isn't it very difficult for a fact finder to say that as a matter of law, no reasonable juror could have found any substantial similarity? Actually, I think it's become very common, and it is, I think, where this arises from is to lay persons, it is difficult for them to understand the distinction between an idea and the expression. So, for example here, I think Mr. Tanksley, in good faith, believed, well, there's a story about a family run record label that's run by an African American man who comes from a disadvantaged past. Well, that's the similar premise, therefore, my idea was stolen, my work was stolen. But what you have to look at is the actual expression, and in the universal athletic sales case of the Third Circuit, contrary to what Paul said, the court, the Third Circuit actually did not command, the court held that it was in as good a position as the trial court to decide this because there are no issues of credibility. You're simply comparing the works, and I would argue that the gatekeeper function of the trial court in this circumstance is even greater under Iqbal and Twombly, because typically, under Iqbal and Twombly, you're looking at a set of facts of antitrust conspiracy, a set of interactions. Here, you're simply saying I read two works, and I say they're substantially similar. The trial court is in a perfectly good position to determine whether that is even plausible by looking at the elements of the work, which is what the court did here, and here, the works really only share that basic idea, and when you get into the concrete expression, the animating premise that drives the sequence of events is promiscuity, reflected in very graphically sexual scenes leading to a rampant groupies outbreak, with all of its attendant consequences that's carried through each of the three episodes. That sort of drives the narrative. You have a subplot of domestic abuse with revenge and adoption, which don't appear in Empire. Contrast with Empire, what drives that story, and it's a completely different story, is a King Lear-style succession drama involving the protagonist's three sons that's kicked off when the protagonist believes he has died from ALS, and then you throw in Cookie, the ex-wife who was a successful music manager in her own right, and she took a drug rap to allow Lucius Lyons to succeed in the music business, and she now feels she has owed something since she served 17 years in prison. She is deeply involved in the three children, who are also involved in this King Lear succession. Now, none of that is in Kring. In fact, the main characters in Empire have virtually no analog in Kring. There's no Cookie character. There are not three sons who are battling each other to be the successor to the company. There is not the Bunky character who is assassinated. To me, this case of the microcosm is this urination scene. They sort of set that up as the keystone of this case. In their brief statement, a shooting occurring while somebody urinates or finishes urinating is not protectable. There have been other movies where that premise has been done. So now let's go below that idea and look at the actual expression. In Kring, the motivation is revenge for domestic abuse. It's henchmen who do the shooting offscreen after Shek Wan, the abuser, finishes urinating, pulls out a gun, and yells into the darkness. He then, turns out, survives the hit. In Empire, the setting is completely different. It's not a dungeon in the dark. It's a freeway overpass that is lit with a city of lights. The person in Bunky is one of the best friends of the lead character, Lucius Lyons. He is extorting him for money to pay off the gambling debt. They actually have a face-to-face conversation. At one point, Lucius Lyons pulls out a gun and shoots him rather cold-bloodedly right in the face. He dies. So the end result is different. The motivation is different. The characters involved. Even the manner of the shooting is different. And that is what courts look at. Appellants can go, Oh, we're just shooting somebody who's urinated. That's been better done than that. Now we get into the actual expression, which the trauma court did, and there's a part of his opinion where he dissects and deconstructs this urination scene. I think he did it because the appellants have made such a big deal out of it. But that in a microcosm is this case. At the level of concrete expression, these works are completely dissimilar. Not even similar, let alone substantially similar. Can I just ask you to respond? Your answer came out of the box with some of the unfairness of the procedure taken by the district court. You were able to, ahead of time, come up with a comparison of clips and all that. How do you respond to that? Well, with the chronology, and I'll do it briefly, but when their original complaint, they put together a six-page side-by-side comparison. They submitted that to the court. The court resubmitted in the first motion the DVD of cream from the Copyright Office and a DVD of Empire first season, some scenes of the second season. That was in April of 2016. There was a whole motion to dismiss process that occurred while the court had that in and announced he was considering that. Later, there was a second amended complaint and another round of motions. The plaintiffs again alleged this side-by-side comparison, and additional episodes of Empire were provided to the court. So the court has now had for almost a year the two works. And we then went forward, and we did provide notice. They claim we did, and we did. It's in the record. I won't belabor that. But we held a hearing, and like good lawyers, we said, well, wait a second. They've claimed the works. The works are before the court. So what do we show you? Parts of the works that prove our point that these are not similar. And that's what we did. They then had another hearing where they spent essentially almost three hours with their own selected excerpts. So this was whether lawyers are supposed to appropriately. So you showed parts that weren't similar. They showed parts that were similar. How much similarity do you need to get past the motion to dismiss things? How much similarity do you need to be plausible? You need plausible, substantial similarity. And they argued that you just need slight or minimal. No court in the land has ever held the standard falls below substantial similarity. What they have done is they've confused some cases where the work, for example, photograph is based on real life visuals or facts, and the courts have held that's entitled to thin protection because it's basically a factually based work. And so some courts have said there has to be even more than substantial similarity. No court has ever held you fall below substantial similarity. And I think, for example, the urination scene was one of the scenes that they played, those clips. And I think it's reflected in the court's decision. When he actually saw these excerpts played out and compared the expression, he was able to quite readily conclude these are two wholly different scenes in their actual expression as opposed to the basic premise which everyone admits is in the public domain. All right. Thank you, counsel. Thank you. Good morning, Your Honors. Matthew Shapiro representing the accolades, Sharon Pinkinson in the Greater Philadelphia Film Office. I want to start actually by saying that I agree with Mr. Stone, maybe not surprisingly, but I want to say that because it raises the important point that if he's right and there's no direct infringement, I'm out. My clients are out. Direct infringement is element number one for any theory of contributory copyright infringement. So everything else that I'm going to talk about actually is just additional reasons why Judge Slomski's dismissal of my clients was correct and should be affirmed. It seems to me that I think the preemption question is an interesting question. I assume you're prepared to discuss that. But do we need to get there if we agree there was no duty? No. And I was going to say, Your Honor, the preemption question is an interesting question. And I think there's three ways that Your Honors can affirm the dismissal of the negligence claim. And I think that's probably the most complicated here. I think we win, obviously, anyway. But I think number one on negligence, I think they've waived that. The district court plainly ruled that there was no duty. And Your Honors can read through the issues presented in the briefs. They waived the negligence claim or the misrepresentation claim? The misrepresentation claim is not against my clients. The negligence claim is against my clients. And, yes, I believe the clear holding of the district court that there's no duty, I believe, has been waived. I think that was not raised in their issues presented. So I think that's the easiest way to take care of the negligence claim against my clients. I believe the equally easy way is that substantively nobody's ever held that there's a duty here to protect against a copyright infringement when all you're doing is hosting a film festival. And, in fact, Judge Shigata, the question you asked, which began to touch on the temporal element, I think is actually a key to why there can't be any secondary liability, there can't be any contributory copyright infringement here. And if the case law is actually very clear that to have contributory copyright infringement, you need both a material contribution or an inducement to the direct infringement, and you need to have knowledge of that while you are doing it. And here what we have is none of that. And if you look at it temporally, it simply can't be. You have a film festival which is hosted in April of 2008. And, yes, we do that. My clients do that. They set up the film festival. At the film festival, there are allegations regarding the access, and I think that has been conceded for the pleading stage. At some point after that is the allegation. Something happens with Fox and Mr. Daniels and, you know, whether they infringe or not. Again, I think that's clear. But that's separate and later, and there's no allegation that any of that has anything to do with my clients. There's no allegation. I don't know. I think Mr. Tanks would probably say, hey, just because it took you a few years to get around to it doesn't really absolve you of anything. No. But, Your Honor, again, my clients are Sharon Pinkinson and the Greater Philadelphia Film Office. So if there's an allegation that it took a couple of years for Mr. Daniels to get around to it, then in that intervening time, we had nothing to do with that. We didn't take any actions. We didn't do anything which would induce him to act several years later. All that we did was set up a festival. What we did, in essence, is no difference than— Well, they're saying you didn't take steps to protect what was presented. That's exactly what they're saying, that we didn't take steps to present, and failure to take steps to present is not something that has been held satisfactory to allege a contributory copyright-casing claim anywhere under any authority of which I'm aware. It would be no different, Your Honor, than if, let's say, Barnes & Noble invited someone to read from their book, and someone comes in and reads at Barnes & Noble, and we've all been at readings at Barnes & Noble, and someone might be taping that recording. Someone might choose that event to buy a copy of the book, go home and copy it and sell the copies. Someone might go home and rewrite everything that they heard, but no one would suggest that Barnes & Noble was liable for that because Barnes & Noble had no knowledge that anyone specific was coming into the store with the intention of doing that. In the same way, here, my clients invited people to come and present, which they did. Here, my client invited people to judge, which they did. There's no other allegation that my clients knew or did anything, and none of that creates the active steps that are required to create a contributory copyright claim, and none of that suggests we had knowledge that anyone would be involved in any kind of direct infringement. And without those things, you cannot have a contributory copyright claim. Okay, thank you, counsel. Thank you, Your Honors. Your Honors, just quickly, I'd like to address, first of all, the appellees stand up here and they went through a whole recitation of their perception of what these works were about, and that's part of the problem, and that's what happened in front of the lower court. Mr. Stone stood there and gave his analysis about the mental interpretation of Andre and everything else that an expert is supposed to do. That didn't happen in this case in the lower court. What did happen was that a section got the experts, and that should not have happened. We were never given the content of the material they were going to present before they presented it. That is an error of law. That becomes a dissection analysis that's done in the first element of the test, of the copying. That's what's permitted in that type of analysis. That wasn't done here. So the court didn't do the substantial similarity test correctly. What also is missing in the opinion, and this is important, there's no, it's all one-sided. It's all about, it's nothing about showing an infringement case. Where is the opinion? Well, here's an infringement case, and why isn't this case like that case? There's none of that type of analysis. That's commonplace in legal analysis. It's missing here, and I'm suggesting to you it's missing because it's all one-sided in the opinion, in the way it's written, and it places too heavy a burden, and so do the accolades place too heavy of a burden of what the plaintiff has to show, has to prove here, but to show that the works are identical. That's not what's required. We also misstate what we're suggesting. If you read the briefs, we talk about the standard in terms of if it's a highly artistic work, you don't have to show identity of the works. It's enough to show originality, expression, and things of that nature that can withstand a substantial similarity scrutiny and analysis. I know you were at the motion to dismiss stage, but you ran hearings. Did you ever make a specific request for discovery or for experts? In terms of the court, we had discovered him whenever we started. We issued interrogatories. We issued a request for production of documents. We had a subpoena that was done. All of that had already started to take place. The judge knew this. We made that point. Were there any responses to the discovery? Correct, there were. There were? And this is all while the motion to dismiss was happening, so the court was well aware that there was discovery. The court was well aware that it was a Lee Daniels addition. Did you ever submit to the court a request to provide expert testimony? I know we verbally had the discussion about expert testimony. I don't know if we specifically had that at the motion to dismiss stage. I understand. No, but we certainly had that discussion, absolutely, about expert testimony, but what was happening was not appropriate without that expert testimony. And I submit to you, I'll use the words of Martin Luther King, the time is always ripe to do the right thing, and this is the time and hours to do the right thing. If this plan, this valid copyright, direct access, evidence of copying, and substantial similarities that are enough under the law in this circuit can't get into a court to get to discovery, there's no opportunity for anyone to ever get in front of any court and accommodate infringement case. So we ask for reversal of command. Thank you, counsel. Thank you. We will take the case under advisement. We want to thank counsel for excellent argument and briefing. And actually, if counsel is amenable, we'd like to greet you more personally at sidebar and shake your hands. Absolutely.